UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CRAIG WEIGHALL,

    Plaintiff,

v.

LT. PEA, *et al.*,

    Defendants.

Case No. C06-5663 RBL/KLS

REPORT AND RECOMMENDATION

**NOTED FOR:**
**May 22, 2009**

Before the Court are the motions for summary judgment of Defendants Lt. James Pea and Savouth Uch. Dkts. # 60 and 61. Defendants seek summary dismissal of Plaintiff Craig Weighall's claim that he was denied due process when Defendants placed him in administrative segregation without infraction or hearing.[1] Defendants argue that Mr. Weighall has failed to exhaust his administrative remedies, that he has failed to state a claim upon which relief may be granted, and that they are entitled to qualified immunity. In support, Defendants rely on their sworn declarations (Dkt. # 60-2, pp. 14-15[2] "Pea Declaration"; Dkt. # 60-2, pp. 37-38 "Uch Declaration"), the Lewis County Jail Handbook (Dkt. # 60-2, pp. 16-36), and the Declaration of Erin Aitken, an Officer of the Lewis County Jail (Dkt. # 61-4, pp. 1-6).

---

[1] This is the sole remaining claim. Defendants were previously granted summary dismissal of Mr. Weighall's Eighth Amendment medical and condition of confinement claims. Dkt. # 45.

[2] CM-ECF pagination.

REPORT AND RECOMMENDATION - 1

On December 29, 2008, Mr. Weighall filed what appeared to be his response to Defendants' motion for summary judgment. Dkt. # 66 ("Declaratory Judgment 57.3 Objection to Defendants Summary Judgment," with attached "Court's Findings of Defendants Summary Judgment 56.4"). Upon closer review, however, the purpose of the pleadings and exhibits filed by Mr. Weighall is not at all clear. The pleadings do not appear to be in response to the Defendants' pending motion.

As to this motion, Mr. Weighall has filed no response. Under Local Rule 7 (b)(2), failure to file papers in opposition to a motion may be deemed by the Court as an admission that the motion has merit.

After careful review of the motions, supporting declarations and documents, and balance of the record, and viewing the facts in the light most favorable to Mr. Weighall, the undersigned recommends that Defendants' motion should be denied as to whether Mr. Weighall exhausted his remedies as there remain questions of material fact, but granted as to whether Defendants violated Mr. Weighall's due process rights when they initially placed him in administrative segregation because Mr. Weighall had no protected liberty interest in being free from confinement in Ad-Seg.

## I. SUMMARY OF CASE

Mr. Weighall was held in the Lewis County Jail for six months in 2005 and spent approximately half of that time in administrative segregation ("Ad-Seg"). He sued James Pea, a Lieutenant at the Lewis County Jail (the "Jail"), Savouth Uch, a former officer at the Jail, and Mary Briggs, a nurse employed by a medical group under contract with the Jail to provide medical care to inmates. Mr. Weighall claimed that he was denied medical treatment and special handicap accommodations in violation of his Eighth Amendment rights. Defendants were granted summary dismissal of these claims and Ms. Briggs was dismissed from the case. Dkt. # 45.

Mr. Weighall's remaining claim is that Defendants Pea and Uch violated his due process rights when they placed him in Ad-Seg without an infraction and a disciplinary hearing. He also claims that during the time he was in Ad-Seg, he was denied access to writing materials so that he was unable to file a grievance.

REPORT AND RECOMMENDATION - 2

## II. FACTS

Mr. Weighall was at the Lewis County Jail from April 25, 2005 until October 27, 2005. Dkt. # 61-4, p. 1. At the time of his booking, Mr. Weighall wanted to be placed in a handicap accessible cell because he is missing one leg. Dkt. # 61-4, p. 2. The unit where Mr. Weighall was placed was also used as the Protective Custody Unit at the Jail at that time as the Jail was being remodeled and expanded. *Id.*, pp. 1-2. Mr. Weighall's placement in the new unit was the result of his handicap and was not based on a classification procedure. *Id.*

After Mr. Weighall was assigned to this cell, Sheriff McCroskey ordered that all Protective Custody inmates (which included Mr. Weighall due to his placement in that unit) were to be limited to one hour out of their cells per day for recreational purposes. *Id.* It is not clear when this new policy took effect. While Mr. Weighall's time out of his cell was limited due to his placement in the Protective Custody unit, he was not placed in Ad-Seg until July 23, 2005.

After this new policy was instituted, Mr. Weighall requested to be relocated to the General Population. *Id.* His request for relocation was reviewed on June 2, 2005 by the Classification Committee. *Id.* Around that same time, however, Mr. Weighall's medication was being re-evaluated and he was notified in writing that his housing status would remain the same. *Id.*, pp. 2-3. Also during the month of June 2005, the evidence reflects that Mr. Weighall housing status remained unchanged so that he could be examined by mental health professionals while accommodating his disability. *Id.*, p. 3.

On July 23, 2005, officer assistance was requested to Mr. Weighall's cell. *Id.*, p. 3. Mr. Weighall was found on the floor stating that bugs were crawling all over him and he was afraid that the officers were there to hurt him. *Id.* Mr. Weighall's crutch was propped such that it would keep the sink water running. *Id.* He also removed his identification wristband. *Id.* There was a piece of paper covering the intercom in the room. *Id.* Paper also covered both vents with toothpaste. *Id.* Two ink pens were also discovered. *Id.* Mr. Weighall's cell was cluttered and not clean. *Id.* According to Officer Aitken, each of these items are minor infractions, except for the removal of the wristband, which is a major infraction according to the inmate handbook. *Id.* Sgt. Clear issued

REPORT AND RECOMMENDATION - 3

Mr. Weighall an infraction for "continuous disruptive behavior," and placed him in Ad-Seg. *Id.* Mr. Weighall received his sanction of Ad-Seg 1/24 in writing, but he did not request a review of this decision and did not file a kite. *Id.*

Officer Aitken states that Mr. Weighall's status was reviewed on July 26, 2005 "during the regular weekly non-adversarial classification meeting," when the decision was made that Mr. Weighall would remain on Ad-Seg "based on the circumstances." *Id.*, p. 4.

Inmates on Administrative Segregation receive one hour out every twenty-four hours and are considered to be on a disciplinary status. *Id.*, p. 4. In contrast, Maximum and Protective Custody inmates are not considered to be on a disciplinary status. *Id.* Inmates on Administrative Segregation do not receive "good time" or early release credits (ERC) for the days they serve while on this status, nor are they allowed other privileges such as church group, alcohol groups, or commissary (except for hygiene items). *Id.*

Eleven days later, on August 4, 2005, Officer Uch inspected Mr. Weighall's cell. *Id.* Mr. Weighall had again removed his identification wristband and stated that he threw it away a few days prior. *Id.* This is a major infraction. *Id.* Because Mr. Weighall was already on Administrative Segregation 1/24, his sanction was increased to one hour out every forty eight hours. *Id.* Mr. Weighall received this status update of "Ad-Seg 1/48 " in writing. *Id.* Mr. Weighall did not request review of this decision. *Id.* It is not clear from the facts presented to the Court as to who decided to give the sanction.

On September 1, 2005, Mr. Weighall received another sanction for covering his top vent with a piece of paper. *Id.*, p. 4. Mr. Weighall received a status update of "Ad-Seg 1/72" in writing. *Id.*, pp. 4-5. When questioned, Mr. Weighall stated that he had nothing to lose. Mr. Weighall did not request review of this decision. *Id.*, p. 5. Again, the facts are not clear as to who issued this sanction. Based on the inmate handbook, covering a vent is considered a minor infraction. Dkt. # 60-2, p. 35.

Between September 9, 2005 and September 13, 2005, Mr. Weighall flooded his cell and attempted to crush out his cell windows with his crutches. *Id.* Officer Aitken states that at this

REPORT AND RECOMMENDATION - 4

time, because Mr. Weighall was already at the top of the disciplinary sanction list, the only step in corrective action which could be taken was to review Mr. Weighall's status weekly during the Classification Committee meetings. *Id*. If Mr. Weighall's behavior improved, from one weekly Classification Committee meeting to the next, his sanction would be decreased back to having one hour out every forty eight hours instead of every seventy two hours. *Id*.

According to Officer Aitken, this weekly practice is applied to any inmate placed on this sanction. *Id*. All inmates on "Ad-Seg" have to work their way back down to one hour out every twenty four hours before being considered for removal from "Ad-Seg." *Id*. Mr. Weighall continued to be on "Ad-Seg 1/72" because his behavior did not improve, thus he did not earn a decrease in his disciplinary status. *Id*.

On September 20, 2005, Lt. Pea reviewed Mr. Weighall's status and decreased it from "Ad-Seg 1/72" to "Ad-Seg 1/48". *Id*. Officer Aitken states that Mr. Weighall received his status change notification in writing. *Id*. Although it is not clear, the Court assumes Lt. Pea made this decision based on his authority as a Lieutenant. The Court has no knowledge as to who was actually on the Classification Committee.

On October 5, 2005, Mr. Weighall's status was reviewed by someone and his status was decreased from "Ad-Seg 1/48" to "Ad-Seg 1/24." According to Officer Aitken, Mr. Weighall received this status update in writing. *Id*, p. 5. On October 11, 2005, Mr. Weighall's status was reviewed by someone and he was removed from Ad-Seg to General Population. *Id*., p. 5. *Id*. Officer Aitken states that Mr. Weighall received this status update in writing. *Id*. At this time, the Classification Committee determined that the new Unit D2 was best utilized as a Medium Housing Unit. *Id*., p. 5. Mr. Weighall was housed in Unit D2 and remained there for the next fifteen days until his release. *Id*.

Mr. Weighall did not earn any early release credit or good time credits during the time he spent in Ad-Seg. *Id*. He did not serve more time than his original sentence. *Id*., p. 6.

The Lewis County Jail Inmate Handbook, which was in effect during Mr. Weighall's incarceration, included a right to request a review of any decision that affects an inmate's rights

REPORT AND RECOMMENDATION - 5

with regard to grievances and appeals. For example, if an inmate receives a major infraction, a hearing is provided to the inmate after 24 hours have passed but before 72 hours, unless the inmate signs a waiver. Dkt. # 60-2, p. 24 (CM/ECF page numbering). The inmate has the right to appeal the decision to the Classification Sergeant by submitting a grievance within 24 hours, indicating the reason for the appeal. *Id*. If an inmate receives a minor infraction, a sanction must be approved by a shift supervisor but a hearing is not afforded to the inmate. *Id*., p. 23. Continuous disruptive behavior may result in administrative segregation. *Id*., p. 28. An inmate has the right to appeal his classification by writing to the Classification Officer requesting an investigation of the classification. *Id*., p. 27. The Classification Officer has the final say, following normal guidelines. *Id*.

The inmate handbook was posted in the common area of each living unit in the Jail. Dkt. # 60-2, p. 14. According to Defendant Pea, Mr. Weighall had access to the same classification and review process as all other inmates. He had the opportunity to request, by written request or "kite," a formal review by the Classification/Compliance committee which meets weekly to review the classification of inmates, specifically those who are placed in a special housing category, and/or those requesting such reviews. Dkt. # 60-2, p. 14. Defendant Pea states that Mr. Weighall utilized this process on a regular basis, that his requests for reviews were always granted and that Mr. Weighall was notified in writing as well as sometimes verbally of the results of the review. *Id*.

Defendant Uch states that Mr. Weighall's status was reviewed on a weekly basis by the Classification Committee, which consisted of "2 Classification Officers, Sergeant, Lieutenant, Medical Staff, Mental Health Counselor, and a Chemical Dependence Counselor." Dkt. # 60-2, p. 37. Once a decision is made, the Lieutenant has the authority and discretion to formally adopt the decision or make a different decision and the inmate is provided a copy of the decision. *Id*. Defendant Uch states that Mr. Weighall was provided notice of decisions made by the Classification Committee and that this procedure continued during Mr. Weighall's confinement at the Lewis County Jail. *Id*.

Defendant Pea states that he also made himself available to Mr. Weighall informally in

REPORT AND RECOMMENDATION - 6

person, on several occasions when Mr. Weighall passed by Defendant Pea's office or the Jail corridors as Mr. Weighall was being escorted through the facility. Dkt. # 60-2, p. 15. Defendant Pea states that Mr. Weighall specifically stated that he was not satisfied with his current housing and wanted to move back to Medical Observation or the "new" part of the jail. *Id*. Defendant Pea advised Mr. Weighall that he needed to request a review through the classification process. *Id*.

Officer Aitken states that all inmates may ask for a review of any decision that affects them. Dkt. # 61-4, p. 4. Officer Aitken also states that it is the practice of jail staff to fill out a "kite"or request review for an inmate too, especially if an inmate is not competent or an inmate temporarily lost the privilege of having writing utensils in his/her cell. *Id*.

## II. STANDARD OF REVIEW

Summary judgment shall be rendered if the pleadings, exhibits, and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56(c). In deciding whether summary judgment should be granted, the court must view the record in the light most favorable to the nonmoving party and indulge all inferences favorable to that party. Fed. R. Civ. P. 56(c) and (e). When a summary judgment motion is supported as provided in Fed. R. Civ. P. 56, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in Fed. R. Civ. P. 56, must set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e). If the nonmoving party does not so respond, summary judgment, if appropriate, shall be rendered against that party. *Id*.

The moving party must demonstrate the absence of a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). Mere disagreement or the bald assertion that a genuine issue of material fact exists does not preclude summary judgment. *California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987). A "material" fact is one which is "relevant to an element of a claim or defense and whose existence might affect the outcome of the suit," and the materiality of which is "determined by the substantive law governing the claim." *T.W. Electrical Serv., Inc. v. Pacific Electrical Contractors*

REPORT AND RECOMMENDATION - 7

*Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

Mere "[d]isputes over irrelevant or unnecessary facts," therefore, "will not preclude a grant of summary judgment." *Id.* Rather, the nonmoving party "must produce at least some 'significant probative evidence tending to support the complaint.'" *Id.* (quoting *Anderson*, 477 U.S. at 290); see also *California Architectural Building Products, Inc.*, 818 F.2d at 1468 ("No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment."). In other words, the purpose of summary judgment "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990).

### III. DISCUSSION

**A.  Exhaustion of Remedies**

The Prison Litigation Reform Act ("PLRA") requires exhaustion of administrative remedies prior to filing a complaint in federal court. The relevant portion of the PLRA states:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

This requirement "applies to all prisoners seeking redress for prison circumstances or occurrences." *Porter v. Nussle*, 534 U.S. 516, 520 (2002). Further, "[a]ll 'available' remedies" must be exhausted, "[e]ven when the prisoner seeks relief not available in grievance proceedings." *Id.* at 524. Inmates must exhaust prison grievance remedies before filing suit if the grievance system is capable of providing any relief or taking any action in response to the grievance, and must do so in a timely manner. *Booth v. Churner*, 531 U.S. 956, 121 S. Ct. 1819, 1825 (2001); *Woodford v. Ngo*. 548 U.S. 81, 126 S.Ct. 2378, 2386 (2006). The purpose of the exhaustion requirement is to "reduce the quantity and improve the quality of prisoner suits; . . . [and] afford corrections officials . . . opportunity to address complaints internally. . . . 42 U.S.C. § 1997e(a). *McKart v. United States*, 395 U.S. 185, 195 (1969).

REPORT AND RECOMMENDATION - 8

In deciding whether the PLRA exhaustion standard has been met, it must be remembered that § 1997e(a) is an affirmative defense. *Wyatt v. Terhune*, 315 F.3d 1108, 1119 (9th Cir. 2003). Defendants have the burden of raising and proving the absence of exhaustion. *Id*. There can be no "absence of exhaustion" unless some relief remains "available," and a defendant must demonstrate that pertinent relief remained available, whether at unexhausted levels of the grievance process or through awaiting the results of the relief already granted as a result of that process. *Brown v. Valoff*, 422 F.2d 926, 937 (9th Cir. 2005).

When Defendants Pea and Uch originally moved for summary judgment on the grounds that Mr. Weighall failed to exhaust his remedies, the undersigned concluded they had not met their burden because they failed to provide evidence of the grievance procedures available at the Lewis County Jail and failed to rebut evidence presented by Mr. Weighall in his declaration that while he was in administrative segregation, he was denied the use of writing utensils which could have coincided with his time limits for filing a grievance. *See* Dkt. # 40, p. 7. Mr. Weighall claimed that, on "at least two separate occasions," after he filed his first grievance, his writing materials were taken away from him and exhaustion was not fully possible "because of Defendant Lt. Pea's involvement in the removal of pen and paper" from his possession. Dkt. #30, p. 2; Dkt. # 31, p. 2. In addition, in his sworn complaint, Mr. Weighall alleges that he was placed in a maximum security isolation cell without any disposition hearing as to why and one month later, his writing paper and pen were taken away. Dkt. # 5, p. 5. After five days medical observation, Defendant Uch assigned him to the same cell and three weeks after staff took his writing materials, they returned them. *Id*. He wrote to the ACLU, and when staff discovered that he had written to the ACLU, they again removed his writing materials and this time, he could not write to anyone for two months. *Id*.

Mr. Weighall also alleges that he was allowed out of his cell only one hour every three days. Dkt. # 5, p. 6. When he asked what he had done to deserve such treatment, Officer Sabo replied, "I am not qualified to answer that." *Id*. When he asked CO Jackie if he could have a grievance form, she replied, "Craig, it wouldn't be worth the paper to write it on." *Id*. When he

REPORT AND RECOMMENDATION - 9

attempted to write the ACLU, they took away his paper and pen, put him in a smock and supplied just one blanket for his bed linen. *Id.*

The inmate handbook states that inmate grievances must be in writing; that a form is available upon request and must be filed within 24 hours of the alleged incident. Dkt. # 60-2, p. 26. The handbook also states that an appeal form is available upon request if the inmate is not satisfied with the response to his grievance and that he must resubmit the original grievance and response along with the completed appeal form, within 72 hours of receipt of the original response. *Id.*

In response, Officer Aitken states that "at all times, Mr. Weighall had access to writing materials and paper to file or request review of any decision that affected him." Dkt. # 61-4. However, that statement is directly contradicted by Mr. Weighall's statement that he did not have access to writing materials on at least two occasions, that one staff member told him a grievance would be futile, and the inmate handbook clearly requires inmate grievances to be in writing.

Officer Aitken also states that "it is the practice of jail staff to fill out a "kite" or request review for an inmate too, especially if an inmate is not competent or in inmate temporary [sic] lost the privilege of having writing utensils in his/or cell." Dkt. # 61-4, p. 4. However, there is no evidence before the Court that Mr. Weighall was aware of this practice or that any assistance was ever offered to him. On the other hand, there is also evidence that when Mr. Weighall engaged in conversations with Defendant Pea to express his dissatisfaction with his housing, Defendant Pea told him to request review through the classification process; a process that requires a writing. Dkt. # 60-2, p. 27.

Finally, Defendant Pea states that Mr. Weighall utilized the kite process to request formal review by the classification/compliance committee on a regular basis, that his requests for review were always granted, and that he was notified in writing as well as verbally of the results of the review. Dkt. # 60-2, p. 14. These statements could as easily be interpreted to mean that Mr. Weighall has, in fact, exhausted his remedies.

Viewing the evidence in the light most favorable to Mr. Weighall, the undersigned

REPORT AND RECOMMENDATION - 10

concludes that there are material issues of fact regarding whether Mr. Weighall exhausted his administrative remedies. Dkt. # 60-2, p. 14. There is evidence before the Court that Mr. Weighall's ink pen and other writing utensils were taken away from him such that there were periods of time that he could not file grievances. The record is not clear as to when these time periods occurred. Officer Aitken suggests that it is the policy of jail staff to assist inmates in submitting grievances, but there is no evidence that jail staff, in fact, assisted Mr. Weighall or that he was, in fact, aware of this policy. On the other hand, there is evidence that when Mr. Weighall requested a grievance form from a jail officer, he was told it was not worth the paper on which it would be written. The Jail Handbook requires him to file a written request for classification review and that is what Defendant Pea told him to do.

Based on the foregoing, the undersigned recommends that Defendants' motion for summary judgment based on exhaustion be denied as Defendants have failed to carry their burden of proof.

**B.  Due Process**

Mr. Weighall alleges that Defendants violated his due process rights under the 14th Amendment when they placed him in Ad-Seg with no disciplinary write-up or hearing. Dkt. # 5, pp. 3, 6; Dkt. # 30, pp. 1-2. He also asserts that Defendant Pea ordered Defendant Uch, the classification officer, to place him in the maximum security isolation cell, (Dkt. # 5, p. 3), but he provides no facts to support that assertion. Defendant Uch was the Classification Officer while Mr. Weighall was incarcerated at the Jail. Dkt. # 60-2, p. 37. The evidence reflects that Defendant Pea was also involved in reviewing Mr. Weighall's Ad-Seg status. *See, e.g.,* Dkt. # 61-4, p. 5 (Aitken Declaration).

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 569 (1972). Thus, the threshold inquiry for the Court is whether Mr. Weighall's confinement in Ad-Seg implicates a protected liberty interest. If a liberty interest is at stake, the Court must then determine what procedures Mr. Weighall was

REPORT AND RECOMMENDATION - 11

entitled to under the Due Process Clause. *See, e.g., Wilkinson v. Austin,* 545 U.S. 209, 125 S.Ct. 2384, 2393 (2005). Finally, the Court evaluates whether the process Mr. Weighall actually received in this case comported with the minimum requirements needed to satisfy due process.

The Fourteenth Amendment's Due Process Clause does not trigger the need for procedural protections in every instance involving an individual's deprivation of liberty or property at the hands of the state. *See, e.g., Roth,* 408 U.S. at 569, *Ingraham v. Wright,* 430 U.S. 651, 672 (1977). Rather, only when there is a liberty interest at stake is due process implicated. *Id.* Liberty interests protected by the Fourteenth Amendment may arise from either the Due Process Clause itself or from state law. *Meachum v. Fano*, 427 U.S. 215 (1976).

"It is well-established that '[t]he requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property.'" *Burnsworth v. Gunderson*, 179 F.3d 771, 774 (9th Cir. 1999) (quoting *Bd. Of Regents v. Roth*, 408 U.S. 564, 569) "Under *Sandin*, a prisoner possesses a liberty interest under the federal constitution when a change occurs in confinement that imposes an 'atypical and significant hardship ... in relation to the ordinary incidents of prison life.'" *Resnick v. Hayes*, 213 F.3d 443, 448 (9th Cir. 2000) (quoting *Sandin*, 515 U.S. at 484). "There is no single standard for determining whether a prison hardship is atypical and significant, and the 'condition or combination of conditions or factors [of the alleged hardship] ... requires case by case, fact by fact consideration.' " *Ramirez v. Galaza,* 334 F.3d 850, 861 (9th Cir.2003), quoting *Keenan,* 83 F.3d at 1089.

While administrative segregation "typically ... in and of itself does not implicate a protected liberty interest," it may do so under certain circumstances. *Serrano v. Francis*, 345 F.3d 1071, 1078 (9th Cir. 2003) (holding that a handicapped inmate who was confined in administrative segregation for two months without use of his wheelchair suffered an atypical and significant hardship), *cert. denied*, 543 U.S. 825 (2004). *See also, Jackson v. Carey*, 353 F.3d 750 (9th Cir. 2003) (allegations of three-custody levels materially different from one another causing major disruption to prisoner's environment sufficiently plead section 1983 due process claim); *Ramierz*,

REPORT AND RECOMMENDATION - 12

334 F.3d at 861 (reversing and remanding dismissal of due process claim for application of *Sandin* factors where prisoner alleged his segregated unit was overcrowded and violent, isolation severed ties with his family, he was required to participate in psychiatric programs and he was in confinement for a period of two years).

Prisoners in Ad-Seg, such as Mr. Weighall, are considered to be on disciplinary status. Dkt. # 61-4, p. 4. The manner in which Mr. Weighall's confinement is classified is relevant insofar as it defines his condition of confinement, but the controlling issue is how those conditions compared to confinement in the general population or non-punitive administrative segregation. *See Sandin*, 515 U.S. at 476 n. 2 (holding that no protected liberty interest existed where "at the time of [the prisoner's] punishment, disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody," all of whom were housed in the same special holding unit); *Ramirez*, 334 F.3d at 861 (reversing and remanding for application of the *Sandin* factors where the prisoner was confined in administrative segregation for disciplinary reasons); *Resnick*, 213 F.3d at 444 (holding that plaintiff" has not alleged that his confinement, whether administrative or disciplinary, presented the type of atypical, significant deprivation that might conceivably create a liberty interest") (internal quotation marks and ellipsis omitted).

*Sandin* makes clear that the focus of the liberty interest inquiry is whether the challenged condition imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life. *Sandin*, 515 U.S. at 483-84. "*Sandin* requires a factual comparison between conditions in general population or administrative segregation (whichever is applicable) and disciplinary segregation, examining the hardship caused by the prisoner's challenged action in relation to the basic conditions of life as a prisoner." *Jackson v. Carey*, 353 F.3d 750, 755 (9th Cir. 2003)(citing *Resnick*, 213 F.3d at 448; *Duffy v. Riveland*, 98 F.3d 447, 457 (9th Cir. 1996); *Keenan v. Hall*, 83 F.3d 1083, 1088-89 (9th Cir. 1996); *Mitchell v. Dupnik*, 75 F.3d 517, 522 (9th Cir. 1996)). "What less egregious condition or combination of conditions or factors would meet the test requires case by case, fact by fact consideration." *Kennan*, 83 F.3d at 1089.

REPORT AND RECOMMENDATION - 13

With regard to administrative segregation, the factual determination requires consideration of (1) whether the challenged condition "mirrored those conditions imposed upon inmates in administrative segregation and protective custody," and thus was comparable to restrictions that are within the prison's discretionary authority; (2) the duration of the condition or confinement, and the degree of restraint imposed; and (3) whether the action will necessarily impact the duration of the prisoner's sentence. *Id.*; *Keenan*, 83 F.3d at 1089. With regard to disciplinary segregation, the factual determination requires "a factual comparison between conditions in [the prison's] general population or administrative segregation (whichever is applicable) and disciplinary segregation, examining the hardship caused by the prisoner's challenged action in relation to the basic conditions of life as a prisoner. *Jackson v. Carey*, 353 F.3d 750, 755 (9th Cir. 2003). The presence of the following three factors indicate the absence of a liberty interest in avoiding being placed in disciplinary segregation:

> (1) [the] disciplinary segregation was essentially the same as discretionary [i.e., administrative] forms of segregation; (2) a comparison between the plaintiff's confinement and conditions in the general population showed that the plaintiff suffered no "major disruption in his environment"; and (3) the length of the plaintiff's sentence was not affected.

*Resnick*, 213 F.3d at 448 (quoting *Sandin*, 515 U.S. at 486-87).

However, Mr. Weighall has not alleged nor has he come forward with any evidence that the conditions imposed on him during the three months he was held in disciplinary Ad-Seg were materially different from those conditions imposed on inmates in purely discretionary segregation. Nor is there any evidence that the conditions to which he was subjected created "a major disruption" in his environment. Finally, there is no allegation that the length of his sentence was affected. In this case, Mr. Weighall was confined in Ad-Seg for approximately three months, beginning July 23, 2005 for a major infraction. Mr. Weighall has provided no evidence to demonstrate that the conditions he experienced in the segregation unit constituted an atypical and significant hardship in relation to the ordinary incidents of prison life.

The evidence provided by Defendants, on the other hand, reflects that the conditions imposed on Mr. Weighall during the time he spent in Ad-Seg were the same as other inmates in

REPORT AND RECOMMENDATION - 14

Ad-Seg, that his confinement was not unduly lengthy and that the duration of his sentence was not impacted. The record reflects and Mr. Weighall does not dispute, that all inmates in Ad-Seg receive one hour out every twenty-four hours, are considered to be on disciplinary status, do not receive "good time" or early release credits while so confined. The record also reflects that increases and decreases to Mr. Weighall's "time out" of his cell were part of the disciplinary sanctions applied to all Ad-Seg inmates and were incorporated into the weekly Classification Committee meeting reviews. [3]

Mr. Weighall has provided no evidence to demonstrate that the conditions he experienced in Ad Seg constituted an atypical and significant hardship in relation to the ordinary incidents of prison life. Whether the Court considers his segregation was imposed for administrative or disciplinary purposes, there is no evidence that Mr. Weighall's time in Ad-Seg was materially different from those conditions imposed on other Ad-Seg inmates, that it created a major disruption in his environment, *see, e.g. Resnick v. Hayes*, 213 F.3d 443, 448 (9th Cir. 2000), or that the length of his sentence was affected.

To the extent a protected liberty interest does exist in this case, furthermore, Mr. Weighall has failed to establish he was deprived thereof without due process of law. "The quantum of process constitutionally due to segregated inmates depends upon whether the segregation is punitive or administrative in nature." *Stewart v. Alameida*, 418 F.Supp.2d 1154, 1165 (N.D. Cal. 2006). With respect to administrative segregation, the only procedures that due process requires are that: (1) "an informal nonadversary hearing" be held "within a reasonable time after the prisoner is segregated"; (2) the prisoner be informed of the charges against him or the prison officials' "reasons for considering segregation"; and (3) the prisoner be allowed "to present his

---

[3] Defendants also argue that, to the extent Mr. Weighall is claiming that he had a "due process right to early release credits, he is mistaken." Dkt. # 60, p. 13. Mr. Weighall does not allege that he has a state-created liberty interest in earning good time credits while he was on Ad-Seg on disciplinary status. In addition, inmates do not have an inherent federal constitutional interest in *amassing* good time credits or earning early release. *See In the Matter of Galvez*, 79 Wash. App. 655, 904 P.2d 790 (1995) (emphasis added).

REPORT AND RECOMMENDATION - 15

views to the prison official charged with deciding whether to transfer him to administrative segregation." *Toussaint*, 801 F.2d at 1101; *Stewart*, 418 F.Supp.2d at 1165 (quoting *Hewitt*, 459 U.S. at 476).

Where the loss of a protected liberty interest may result from a disciplinary hearing decision, due process requires the prison inmate to receive: ("(1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action." *Superintendent v. Hill*, 472 U.S. 445, 454 (1985) (citing *Wolff*, 418 U.S. at 563-67).

The record reflects, and Mr. Weighall does not dispute, that he was given written notice of the decision to place him in Ad-Seg. Dkt. # 61-4, p. 3. Mr. Weighall's status was reviewed in a timely manner on July 26, 2005, and was reviewed weekly thereafter by the Classification Committee while he remained in Ad-Seg. *Id.*, pp. 4-5; Dkt. # 60-2, p. 37. The record also reflects that Mr. Weighall received notice of the decisions that affected him in writing and had the opportunity to request review. *Id.*; Dkt. # 61-4, pp. 3-5. In addition, Mr. Weighall does not dispute the evidence that he had the opportunity to request review of the decisions affecting his status and did not.

Accordingly, viewing the evidence in the light most favorable to Mr. Weighall, the undersigned concludes that Mr. Weighall had no protected liberty interest in being free from confinement in Ad-Seg and therefore, no cognizable due process claim.

C.     **Qualified Immunity of Federal Officials**

Defendants also argue that summary judgment should be granted because they are entitled to qualified immunity. Dkt. # 60, pp. 13-16. Because the Court finds that Mr. Weighall has no cognizable due process claim, it need not reach this issue.

### III.  CONCLUSION

For the reasons stated above the Court should **GRANT** the motion for summary judgment of Defendants Pea and Uch (Dkts. # 60 and 61). Pursuant to 28 U.S.C. § 636(b)(1) and Rule

REPORT AND RECOMMENDATION - 16

72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report and Recommendation to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985). Accommodating the time limit imposed by Rule 72(b), the Clerk of the Court is directed to set the matter for consideration on **May 22, 2009**, as noted in the caption.

DATED this 6th day of May, 2009.

/s/ Karen L. Strombom
Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION - 17